**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELOY QUILES,** | : | |
| | : | **Civil Action No. 1:09-CV-580** |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| **CAPTAIN C.M. VITT,** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.     Introduction

This case asks the question: Does a disruptive truck driver have such a clearly established constitutional right to drive onto a secure military facility that he can defeat a claim of qualified immunity by the base commander who has barred him from the base?

We conclude that there is no clearly established constitutional right for disruptive truckers to foray onto military facilities, and, therefore, recommend that the Defendant's motion for summary judgment, which raises a threshold defense of qualified immunity, be granted.

## II.     Statement of Facts and of the Case[1]

The case arises out of an October 10, 2008 dispute between the Plaintiff, Eloy Quiles, and security officials at the Naval Support Activity Installation, a secure military facility located in Mechanicsburg, Pennsylvania. As described in the police incident report[2] which detailed this October 10 episode, this incident began when

---

[1] The factual background provided in this report is taken principally from Defendants' statement of material undisputed facts, to the extent they are truly undisputed. While the Plaintiff has in a terse, summary fashion claimed that all factual matters are disputed, this assertion is plainly inadequate. In such instances it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, N.A., 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark N.J. v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. V. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Therefore, the facts we rely upon are those which have not been genuinely contested by any party

[2] We rely upon the facts recited in this report, because those facts formed the basis for the Defendant's bar letter and in the context of qualified immunity analysis it has been held that: "Even if the information given to [ the] Captain . . . regarding [the plaintiff's actions] were ultimately shown to be false, it was objectively reasonable for him to rely on this information and issue the Ejectment Order. See Rogers v. Powell, 120 F.3d 446, 455 (3d Cir. 1997) (holding that the actions of an officer in reliance on what proves to be the flawed conclusions of a fellow officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity)." Fields v. Blake, 349 F. Supp. 2d. 910, 920-921 (E.D.Pa.2004).

Quiles, an Hispanic civilian commercial truck driver, arrived at the Naval Support Activity installation in Mechanicsburg, with a trailer to be dropped off at the facility. (Doc. 33, ¶1, see Incident Report (Ex. A); Voluntary Statement (Ex. B); 12/08/2008 Pringle Letter (Ex. C)).

Upon inspection of the trailer, Harry Harvey, Sr., a civilian transportation assistant at the base, informed Quiles that a rear light of the trailer was not working properly and that without a functioning light the trailer could not be accepted. (Doc. 33, ¶3, Voluntary Statement (Ex. B)). It is reported that, after being informed by Harvey that the trailer would not be accepted in its present condition, Quiles became very angry and "began cursing and saying that he was prejudice[d]."(Doc. 33, ¶4 ).

Quiles then removed a rear light from his own truck and used it to replace the malfunctioning trailer light. Once Quiles performed this repair, he was permitted to enter the facility and proceed to the trailer drop off area. (Doc. 33, ¶5 Voluntary Statement (Ex. B).) Once Quiles arrived at the empty container lot, the police report indicates that Mr. Harvey, the civilian transportation assistant at the base, stated that he observed Quiles attempting to remove a light from one of the other empty trailers to replace the light that he removed from his own truck. Having seen this activity, Harvey approached and confronted Quiles, who denied any wrongdoing. (Doc. 33,

¶6, <u>see</u> Incident Report (Ex. A); Voluntary Statement (Ex. B))[3]. After confronting

Quiles, Harvey contacted Naval Support Activity installation police, and Officer

Jason Harrison was dispatched to the scene. (Doc. 33, ¶ 8.) Officer Harrison, in turn,

informed Quiles of the allegation against him, and Quiles again denied that he had

attempted to remove a brake light from the empty container lot. (Doc. 33, ¶8, <u>see</u>

Incident Report (Ex. A); Voluntary Statement (Ex. B)). Officer Harrison then

informed Quiles that he was nonetheless required to file a report documenting this

incident. (Doc. 33, ¶9, <u>see</u> Incident Report (Ex. A).)

At this point, the base police encounter with Quiles quickly degenerated as

Quiles reportedly indulged in a series of actions which escalated this encounter into

a more serious law enforcement matter. Thus, once Officer Harrison advised Quiles

that he would have to prepare a report of this episode, he observed that Quiles

becoming increasingly aggressive. (Doc. 33, ¶10.) As a result, Officer Harrison

informed Quiles that he would have to pick up the container that he brought on to the

facility, and that he would then be escorted off the installation. (Doc. 33, ¶11.) Officer

Harrison then reported that Quiles responded angrily, threatening to unhook his trailer

---

[3]Following the incident, Harvey submitted a voluntary signed statement,
testifying to the fact that he observed Quiles attempting to remove a
light from an empty container.(Doc. 33, ¶7.)

and leave it in the middle of the road. (Doc. 33, ¶ 11.) Officer Harrison then informed Quiles that if he abandoned the trailer in this fashion, he would be cited for blocking the roadway. (Id.)

According to the police report, Quiles' truculence then began exhibiting itself in other ways. For example, Officer Harrison was compelled to repeatedly ask Quiles for his license, registration, and insurance, and Quiles only complied after Officer Harrison told him that if he did not produce these documents, he would be cited for not surrendering his license on demand. (Doc. 33, ¶12.) After finally surrendering his license, to Officer Harrison, it is reported that Quiles became verbally abusive, shouting at the officer and cursing at him, stating: "This is bullshit!" I am an American Citizen Vietnam Vet! Why are you fucking with me! I will sue you!" (Doc. 33, ¶13.) Quiles reportedly retrieved his registration from the tractor while he continued to shout at Officer Harrison, (id.), causing the officer to warn Quiles that his behavior was becoming aggressive and that if he made any sudden movements Officer Harrison would have to deal with him accordingly. (Doc. 33, ¶14.)

Quiles then handed Officer Harrison his registration, informed the officer that his insurance card was inside the cab of the truck, and began moving towards the truck. (Doc. 33, ¶15.) By this point the incident report reveals that police were sufficiently concerned about Quiles's behavior that Officer Harrison repeatedly

ordered Quiles to stop and refrain from entering the truck cab. (Doc. 33, ¶16.) Quiles did not comply with these instructions. Instead, he opened the door of his truck and entered the cab on the driver's side. (Id.).

At this point, the incident report reveals that Officer Harrison ordered Quiles to show his hands, and Quiles complied. (Doc. 33, ¶17.)Officer Harrison then asked Quiles if there were any weapons in the cab. (Doc. 33, ¶18.) In a step which further exacerbated an already tense encounter, Quiles responded by shouting "Yes," and Officer Harrison observed him reaching down in between the passenger and driver's seat, forcing Officer Harrison to back away from the cab. (Doc. 33, ¶19.)

Quiles' claim that he had brought a weapon onto the base constituted a potentially criminal act, see 18 U.S.C. § 930, and given Quiles' erratic behavior presented a threat to the safety of the officer. Accordingly, the report indicates that Officer Harrison ordered Mr. Quiles to get out of the truck and show his hands. Quiles then turned to face Officer Harrison with a large black folder in his hands. (Doc. 33, ¶20.) According to the police report, Officer Harrison was required to repeatedly order Quiles to drop the folder and put his hands on the truck before Quiles eventually complied. (Doc 33, ¶22.)

Police were then compelled to conduct a weapons search of Quiles, in light of Quiles' assertion that he was armed. During this weapons search of Quiles by Officer

Harrison, the officer reported that Quiles began moving away from him, forcing the officer to restrain Quiles and request back-up assistance.(Doc. 33, ¶22.)

When Officer Harrison completed the weapons search and found no weapon he asked Mr. Quiles if there were any weapons in the truck. Quiles responded, and contradicted his prior statement which claimed that he possessed weapons, by now denying that he had any weapons in the truck. (Doc. 33, ¶23.) Officer Harrison then asked Quiles why he had previously falsely claimed that there were weapons, and Quiles replied that he had made this claim because he was angry. (Id.)

When back-up police arrived on the scene, Quiles was placed in restraints and his vehicle was searched. That search uncovered no weapons and confirmed that Quiles had lied about possessing weapons in his truck. (Doc. 33, ¶¶ 24 and 25.) Quiles was then released from custody and escorted off the installation. Thus, in the span of this single episode security staff documented incidents in which Quiles had allegedly attempted to remove hardware from parked trailers; engaged in profane exchanges with police; refused to comply with security personnel instructions; threatened to obstruct the roadway; lied to police; and falsely claimed to have brought weapons onto the base.

Security personnel prepared a report of this incident which was forwarded to the base commander, Captain C.M. Vitt, for his review. (Doc. 33, ¶¶ 27 and 28

Declaration of Captain C.M. Vitt, USN (Ex. D) ¶¶ 1-8. ). At the time of this incident, Title 50, Section 797 of the United States Code, provided that base commanders properly delegated by the Secretary of Defense can proscribe a "defense property security regulation," a regulation that provides for the safeguarding of a defense property "against destruction, loss, or injury by accident or by enemy action, sabotage, or other subversive actions." 50 U.S.C. § 797(a)(3)(B). Violation of this statute is punishable pursuant to Title 18 of the United States Code. 50 U.S.C. § 797(a)(1); 18 U.S.C. § 1382. Pursuant to this statutory scheme, the Commander, Navy Region, Mid-Atlantic, has delegated to all installation commanders the power to exclude any person from an installation whose conduct, in the opinion of the installation commander, warrants exclusion from the installation. (Doc. 33, ¶29, COMNAVREG MIDLANT INSTRUCTION 5500.3 (2001) (Ex. E); Department of Defense Instruction (DoDI) 5200.08 (2005) (Ex. F).)

In this case, on November 5, 2008, after examining the incident report, reading internal procedures and U.S. Navy Regulations, and consulting with the Office of General Counsel, Captain Vitt issued a debarment letter to Quiles, barring him from re-entry onto the base. (Doc.33, ¶30, see Debarment Order (Ex. G); Vitt Decl. (Ex. D) ¶¶ 6-8.). In this debarment letter, Captain Vitt explained to Quiles that in light of the Incident Report, he believed that a bar order was appropriate to preserve the

security of the Naval Support Activity and the safety of base personnel. Captain Vitt's debarment letter informed Quiles that if he needed to enter any of these installations to conduct business, he could request written authorization to do so. (Doc. 33, ¶31, see id.; Vitt Decl. (Ex. D) ¶¶ 9-10.) However, the letter did not further explain Quiles' administrative appeal rights under federal agency rules and policies, and when Quiles' counsel wrote to Captain Vitt seeking to appeal this decision, Quiles was not afforded an administrative review of this decision. Instead, this lawsuit ensued.

Quiles commenced this action by filing a complaint on March 30, 2009. (Doc. 1) After his initial complaint was dismissed without prejudice, (Docs. 15-18), on February 23, 2010, Quiles filed an amended complaint naming the base commander, C.M. Vitt, as the sole defendant in this action. (Doc. 22.) This amended complaint is a spare, four-page document, which asserts in a summary fashion that the actions of the base commander, barring Quiles from the base following this reported disruptive incident, violated the Plaintiff's due process and equal protection rights under the Fifth and Fourteenth Amendments. On the basis of these alleged constitutional infractions, Quiles demands damages in excess of $100,000.

The Defendant has responded to this complaint by moving for summary judgment. (Doc. 31.) In this motion Vitt argues that he is entitled to qualified

immunity from personal liability for damages, because his actions in barring Quiles were authorized by statute and did not violate any clearly established constitutional rights of the Plaintiff. This motion has been fully briefed by the parties, (Docs. 32 and 35), and is, therefore, now ripe for resolution.

For the reasons set forth below, it is recommended that this motion for summary judgment be granted, and this case dismissed.

## III.    Discussion

### A.    Summary Judgment, Standard of Review[4]

Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[4]While the Defendant's motion is captioned as a motion to dismiss, or in the alternative for summary judgment, the Defendant relies upon matters beyond the pleadings, which is only appropriate on summary judgment, and the parties have briefed and argued this motion as a summary judgment motion. Therefore, we will treat the motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil procedure.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.

Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## B. Qualified Immunity, Standard of Review

Quiles brings this case as a Bivens action against Captain Vitt, seeking to hold the Defendant personally liable for damages as a result of an alleged violation of his due process rights resulting from the order excluding Quiles from the Naval Support Activity installation in Mechanicsburg. In order to establish such a claim a Plaintiff must show the deprivation of a right secured by the United States Constitution. Satisfying these elements alone, however, does not guarantee that Quiles is entitled to recover damages from this public official. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to

liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d

664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity

> balances two important interests – the need to hold public officials
> accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they
> perform their duties reasonably.  The protection of qualified immunity
> applies regardless of whether the government official's error is "a
> mistake of law, a mistake of fact, or a mistake based on mixed questions
> of law and fact."

Pearson, 129 S. Ct. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)

(Kennedy, J., dissenting)).

Determinations regarding qualified immunity, and its application in a given

case, require a court to undertake two distinct inquiries.  First, the court must evaluate

whether the defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194,

201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v. Klem, 499

F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006).

If the defendant did not actually commit a constitutional violation, then the court must

find in the defendant's favor.  Saucier, 533 U.S. at 201.  If the defendant is found to

have committed a constitutional violation, the court must undertake a second, related

inquiry to assess whether the constitutional right in question was "clearly established"

at the time the defendant acted.  Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at

201-02.  The Supreme Court has instructed that a right is clearly established for

purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the

deprivation of federal rights for purposes of qualified immunity. <u>Gruenke v. Seip</u>, 225 F.3d 290, 299-300 (3d Cir. 2000); <u>Crouse</u>, 668 F. Supp. 2d at 671; <u>see also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. <u>See</u> <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

### C. Captain Vitt Is Entitled to Qualified Immunity

Judged against these legal benchmarks, we find that Captain Vitt is entitled to assert qualified immunity as a defense to personal liability in this action. In this case, Quiles' constitutional claims rest upon a spare assertion that Captain Vitt's order barring him from this installation violated his clearly established due process rights under the Fifth and Fourteenth Amendments, and caused him the loss of "his property interest in being permitted to use the above-named naval facilities to earn income." (Doc. 22, ¶ 6.) Thus, Quiles' constitutional claims are premised upon an assertion that the Plaintiff had some property right of access to a military base.

15

Yet this assertion, which is one of the legal lynchpins of Quiles' amended complaint, simply cannot withstand close scrutiny as a constitutional proposition. At the outset, it is clear that Quiles cannot rely upon the Fourteenth Amendment to the United States Constitution to sustain this <u>Bivens</u> action against Captain Vitt, a naval officer. By its terms, the Fourteenth Amendment only applies to state action. Therefore, the Fourteenth Amendment does not circumscribe the discretion of officials of the United States navy which is an "instrumentality of the federal government". <u>Antol v. Perry</u>, 82 F.3d 1291, 1296 (3d Cir. 1996) Because the Fourteenth Amendment does not apply to federal officials and agencies, courts have routinely dismissed claims, like those made here by Quiles, which attempt to invoke the Fourteenth Amendment as a constraint on the federal government. <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d443, 480 (D.C. Cir. 2005)(dismissal of Fourteenth Amendment claims in action against the federal government); <u>Taylor v. United States</u>, 320 F.2d 843, 846 (9th Cir. 1963),("The Fourteenth Amendment applies to state, not federal action"). Therefore, Fourteenth Amendment claims against federal officials simply cannot be sustained since the Fourteenth Amendment only addresses the deprivation of rights by state actors. <u>See</u> <u>Okpala v. Jordan</u>, 193 F. App'x 850, 852 (11th Cir. 2004) (holding "the claims against FCI and Warden Jordan under the Contracts Clause and the Fourteenth Amendment must be. dismissed

because those provisions apply to the States, not the Federal government");<u>United States v. Edwards</u>, 98 F.3d 1364,1368 (D.C. Cir. 1996) (holding "the fourteenth amendment does not apply to the federal government; an equal protection challenge to the statute must be raised under the fifth amendment instead"); <u>Hudson Valley Black Press v. IRS</u>, 307 F. Supp. 2d 543, 545 (S.D.N.Y. 2004) (holding "Plaintiff cannot plead a violation of the Fourteenth Amendment against defendants because the Fourteenth Amendment does not apply to federal actors").

Nor does the Fifth Amendment's due process clause provide Quiles with a general due process right of access to military bases. Quite the contrary, for the past 34 years it has been entirely clear that there is "no generalized constitutional right" of unfettered access to military facilities. <u>Greer v. Spock</u>, 424 U.S. 828, 838 (1976). Indeed, for the past 50 years the United States Supreme Court has recognized "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command," <u>Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy</u> 367 U.S. 886, 893-94(1961), and has explicitly rejected any suggestion that a base commander is constitutionally required under the Fifth Amendment to provide an excluded person with notice and a right to a hearing prior to banning those visitors, holding that "notice and hearing are not constitutionally required." <u>Id</u>. at 895. Indeed, in the context of criminal prosecutions

for illegal re-entry onto military bases, for the past 25 years the Supreme Court has unambiguously sustained the constitutionality of bar letters like the letter issued here by Captain Vitt, United States v. Albertini, 472 U.S. 675 (1985), stating that such bar letters are a necessary incident of the "*unquestioned power* of a commanding officer to exclude civilians." Id. at 687(emphasis added).

Given the plenary, and unquestioned, authority of military base commanders to issue bar letters, courts have frequently concluded that persons who issue or rely upon bar letters in restricting access to military installations are entitled to qualified immunity from damages. Indeed, for the past decade courts have repeatedly held that government officials who act in reliance upon valid military bar letters are entitled to qualified immunity from damages. Thus, in Trueman v. Lekberg, No. 97-1018, 1998 WL 181816 (E.D.Pa. April 16, 1998), aff'd, 168 F.3d 479 (3d Cir. 1998), the court conferred qualified immunity upon military base personnel in a Bivens action involving a military base bar decision, stating that:

> Here, qualified immunity protects the . . . individual defendants because of the objective legal reasonableness of (1) the order . . . barring plaintiff's re-entry without permission, . . . and (2) the undisputed reliance by defendants . . . on the validity of the order. See Pro v. Donatucci, 81 F.3d 1283, 1286 (3d Cir.1996) (focus of qualified immunity is on the objective legal reasonableness of actions taken by public officials) (citing Anderson, 483 U.S. at 639). As held by the Supreme Court, a commanding officer has broad discretion to exclude civilians, as well as service personnel, from a military base-so long as the power is not exercised in a patently arbitrary or discriminatory

manner. See United States v. Albertini, 472 U.S. 675, 690(1985). Moreover, it is not "inherently unreasonable for a commanding officer to issue a bar order of indefinite duration requiring a civilian to obtain written permission before reentering a military base." Id.

Trueman v. Lekberg, No. 97-1018, 1998 WL 181816, *3 (E.D. Pa. April 16,1998).

Similarly, in Fields v. Blake, 349 F.Supp.2d 910 (E.D. Pa. 2004), the court held that a base commander was entitled to qualified immunity for his act of issuing a bar letter, stating in terms that are equally applicable here:

> Captain Blake's only action with respect to Fields involved issuing a letter barring her from NAS Willow Grove. Civilians have no constitutional right to enter a military base. See Greer v. Spock, 424 U.S. 828 (1976). The commanding officer of a military base has wide discretion as to whom he can exclude from the base. Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 893 (1961). It is well recognized that a that a base commander can summarily bar civilians from a military establishment and is not required to afford notice and a hearing prior to barring a civilian from the base. Serrano Medina v. United States, 709 F.2d 104, 109 (1st Cir.1983) (finding that district court did not err in finding "no protected interest" by civilians' summary debarment from military base, stating that "the power to exclude civilians summarily has been acknowledged by almost every court to consider the matter"); Tokar v. Hearne, 699 F.2d 753, 756 (5th Cir.1983); United States v. Gourley, 502 F.2d 785, 786-87 (10th Cir.1973). Captain Blake states in his declaration that he signed the Ejectment Order barring Fields from NAS Willow Grove based on the following information: plaintiff had been eating and dining at the BEQ without paying; plaintiff had a $300.00 unpaid bill from a previous stay at the BEQ; a Pennsylvania court had issued a warrant for plaintiff's arrest for theft; and plaintiff resisted arrest when the Horsham Township Police were taking her into custody. These reasons are well within the Captain's broad authority to "summarily exclude civilians from the area of his command." Cafeteria & Restaurant Workers, 367 U.S. at 893.

Even if the information given to Captain Blake regarding Fields' outstanding bill and arrest warrant were ultimately shown to be false, it was objectively reasonable for him to rely on this information and issue the Ejectment Order. See Rogers v. Powell, 120 F.3d 446, 455 (3d Cir.1997) (holding that the actions of an officer in reliance on what proves to be the flawed conclusions of a fellow officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity). There is no evidence of a constitutional violation by Captain Blake. Accordingly, he is entitled to qualified immunity. Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir.2002) ("If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end and the officer is entitled to immunity.").

Fields v. Blake, 349 F.Supp.2d. 910, 920-921 (E.D.Pa.2004).

Applying these settled legal tenets in this case, it is apparent that Captain Vitt is entitled to qualified immunity for his actions in issuing a bar letter to Quiles. Captain Vitt's authority to issue such a letter was clearly established by statute and naval regulations. Moreover, "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command," Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy 367 U.S. 886, 893-894(1961), is something which the United States Supreme Court has clearly recognized for the past half century. Therefore, we find that the right of the Defendant to take this action, and exclude Quiles, was clearly established as a matter of law.

Furthermore, we note that it is undisputed that Captain Vitt conferred with agency counsel, and only acted to bar Quiles after receiving the advice of agency

counsel. This, too, is powerful proof that Captain Vitt is entitled to qualified immunity in this case. Indeed, in a related context, the United States Court of Appeals for the Third Circuit has recently held that a government official who acts on the advice of counsel "is presumptively entitled to qualified immunity." Kelly v. Borough of Carlisle, 622 F.3d 248, 256 (3d Cir. 2010); see Ginter v. Skahill, 298 F.App'x 161 (3d Cir. 2008)(qualified immunity for officer acting on advice of counsel).

Finally, given the sound legal authority and advice that Captain Vitt possessed, it is also clear that the information he received strongly suggested that exclusion of Quiles was warranted as a factual matter. That information revealed that staff had documented incidents in which Quiles had allegedly attempted to remove hardware from parked trailers; engaged in profane exchanges with police; refused to comply with security personnel instructions; threatened to obstruct the roadway; lied to police; and falsely claimed to have brought weapons onto the base. In short, this information implicated Quiles in a series of offenses, and indicated that he had steadfastly refused to abide by lawful instructions given to him by security personnel, dangerously escalating this law enforcement encounter. As courts have noted: "Even if the information given to [the] Captain . . . regarding [the plaintiff's actions] were ultimately shown to be false, it was objectively reasonable for him to rely on this information and issue the Ejectment Order. See Rogers v. Powell, 120 F.3d 446, 455

(3d Cir. 1997) (holding that the actions of an officer in reliance on what proves to be the flawed conclusions of a fellow officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity)." <u>Fields v. Blake</u>, 349 F.Supp.2d. 910, 920-921 (E.D. Pa.2004).

In his response to this motion, Quiles has not in any effective fashion rebutted the Defendant's claims of qualified immunity. At the outset, we note that Quiles has presented absolutely no legal authority to support his novel claim that he had a clearly established "property interest in being permitted to use the above-named naval facilities to earn income." (Doc. 22, ¶ 6.) This failure, by itself, is fatal to Quiles' claims since–contrary to the assertions in his complaint– settled case law recognizes that there is "no generalized constitutional right" of unfettered access to military facilities, <u>Greer v. Spock</u>, 424 U.S. 828, 838 (1976), and has long acknowledged "*the historically unquestioned power* of a commanding officer summarily to exclude civilians from the area of his command," <u>Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy</u> 367 U.S. 886, 893-894(1961)(emphasis added).

Further, Quiles has not effectively disputed Captain Vitt's claim that he acted in reliance on advice of counsel when he issued the bar letter, and therefore "is presumptively entitled to qualified immunity." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 256 (3d Cir. 2010). This presumption has not been rebutted by Quiles in this

case and further bolsters the qualified immunity claim of the Defendant, providing an independent ground for claiming qualified immunity.

In fact, Quiles' efforts to avoid summary judgment on the issue of qualified immunity are entirely unavailing. At the outset, it appears that Quiles seeks to try to defeat this claim of qualified immunity by asserting that he was never given a right to appeal the bar notice. While it is evident that the bar letter did not clearly describe Quiles' administrative appeal options under military policies and rules, and it further appears that this lack of clarity caused military officials to neglect to adequately respond to a letter from Quiles' counsel requesting an appeal, this failure to more completely describe and more promptly comply with internal agency rules does not defeat this claim of qualified immunity. In this regard, it is well-settled that the doctrine for qualified immunity looks to the state of constitutional case law when determining whether specific rights were clearly established. Therefore, a failure–like the failure claimed here–which simply involves alleged non-compliance with agency policies, practices, or procedures does not defeat a qualified immunity defense when the Plaintiff's constitutional rights were not clearly established. See, e.g., Davis v. Scherer, 468 U.S. 183 (1984); Bradley v. United States, 164 F.Supp.2d 437 (D.N.J. 2001).

In this case, Quiles has not shown that he had a clearly established constitutional right to a hearing, to any notice or to an appeal from Captain Vitt's bar letter. Indeed, Quiles cannot make such a showing here since the United States Supreme Court has long conceded "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command," Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy 367 U.S. 886, 893-894(1961), and expressly rejected any suggestion that a base commander is constitutionally required under the Fifth Amendment to provide an excluded person with notice and a right to a hearing prior to banning those visitors, holding that "notice and hearing are not constitutionally required." Id. at 895. Thus, courts that have considered this issue have consistently held that the type of notice, hearing and appeals that Quiles finds lacking here are, in fact, not constitutionally required. See, e.g., Berry v. Bean, 796 F.2d 713, 717 (4th Cir. 1986); Tokar v. Hearne, 699 F.2d 753, 756 (5th Cir. 1983); Weissman v. United States, 387 F.2d 271,273 (10th Cir.1967); United States v. Jelinski, 411 F.2d 476, 478 (5th Cir. 1969).

Nor can Quiles defeat this claim of qualified immunity by simply asserting, in a summary fashion, that there are disputed factual issues relating to the Defendant's entitlement to this defense. It is well-settled that a party resisting a summary judgment motion may not defeat this motion by simply advancing cursory denials of these

factual averments coupled with speculative and conclusory claims of wrongdoing. In such instances: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (Cir. Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark N.J. v. DuFresne, 676 F.2d 965, 968 (3d. Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d. Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d. Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d. Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d. Cir. 1981)).

In this case, Quiles' response to the summary judgment motion in this case consists of little more than denials of asserted facts, coupled with a speculative assertion that Captain Vitt's statement that Quiles' race played no role in the decision to bar Quiles should not be credited because the Defendant stated he was unaware of Quiles' race, but the police incident report contained a summary notation of the Plaintiff's ethnicity. These denials, and this invitation to discredit the Defendant's

affidavit, are inadequate in our view to create a material issue of fact which precludes summary judgment, particularly in light of the undisputed facts regarding Quiles' conduct that were reported to Captain Vitt at the time he acted. Those undisputed facts disclosed that Quiles had allegedly attempted to remove hardware from parked trailers; engaged in profane exchanges with police; refused to comply with security personnel instructions; threatened to obstruct the roadway; lied to police; and falsely claimed to have brought weapons onto the base. Thus, on these facts "[e]ven if the information given to [the] Captain . . . regarding [the plaintiff's actions] were ultimately shown to be false, it was objectively reasonable for him to rely on this information and issue the Ejectment Order. See Rogers v. Powell, 120 F.3d 446, 455 (3d Cir.1997) (holding that the actions of an officer in reliance on what proves to be the flawed conclusions of a fellow officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity)." Fields v. Blake, 349 F.Supp.2d. 910, 920-921 (E.D. Pa. 2004).

Finally, Quiles complains that summary judgment should not be granted on qualified immunity grounds in this case because he has not had the opportunity to engage in full discovery. This argument misconstrues the fundamental nature of qualified immunity. It is well established that qualified immunity is " an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is

effectively lost if a case is erroneously permitted to go to trial [or the defendants is compelled to undergo other burdens of litigation]." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)(emphasis in original). Therefore, "[w]here possible, qualified immunity should even protect officials from pretrial matters such as discovery, for '[i]nquiries of this kind can be peculiarly disruptive of effective government.' " <u>Chinchello v. Fenton</u>, 805 F.2d 126, 130 (3d Cir. 1986)(citations omitted). In any event, Quiles has not alleged, or properly asserted, what unresolved, disputed material facts exist by either filing affidavits identifying contested material facts which he believes preclude summary judgment, F.R.Civ. P., Rule 56(c)(1) and(4), or showing " by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition . . . ." to the summary judgment motion. Fed. R. Civ. P. 56(d).

In sum, since the constitutional rights claimed by Quiles are not clearly established by case law, and are in fact rebutted by existing case law, and the Defendant who acted on advice of counsel is presumptively entitled to qualified immunity, the Defendant's motion for summary judgment should be granted.

## IV.  __Recommendation__

For the reasons set forth above, IT IS HEREBY RECOMMENDED THAT Defendant's motion for summary judgment (Doc. 31) be granted.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 16th day of December, 2010.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge